IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 24-cr-0018-RMR

UNITED STATES OF AMERICA,

    Plaintiff,

v.

HUMZAH MASHKOOR,

    Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Laura Cramer-Babycz and Jasand Mock, Assistant United States Attorneys for the District of Colorado, and the defendant, Humzah Mashkoor, personally and by counsel, Kathryn Stimson, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.   AGREEMENT

### A.  Nature of the Agreement – Fed. R. Crim. P. 11(c)(1)(C)

This agreement is made pursuant to Fed. R. Crim. P. 11(c)(1)(C). In particular, the parties agree that any sentence imposed in this case may not exceed 5 years. The parties further agree that (1) U.S.S.G. § 3A1.4 applies; and (2) that the term of supervised release to be imposed in this case shall be life, although the defendant may move for early termination of supervised release after completing 10 years of supervised release. The parties understand that, once the Court accepts the plea agreement, the Court is

COURT EXHIBIT
1

required to enter a sentence consistent with the above-described terms. The parties further understand that, if the Court informs the parties that it intends to impose a sentence different from the above-described sentence, either party has the right to withdraw from the plea agreement.

### B. Defendant's Agreement

The defendant agrees to:

(1)    waive indictment and plead guilty to an Information charging a violation of 18 U.S.C. § 2339C(c)(1)(A), (2)(A);

(2)    waive certain appellate and collateral attack rights, as explained in detail below;

(3)    not contest forfeiture as more fully described below; and

(4)    waive certain rights to discovery, as explained in detail below.

### C. Government's Obligations

The government agrees to move to dismiss Count 1 of the Indictment at the time of sentencing. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate the count dismissed pursuant to this agreement and potentially file a superseding indictment.

Provided the defendant does not engage in prohibited conduct or otherwise implicate U.S.S.G. §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government further agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b).

If the defendant engages in conduct which implicates U.S.S.G. § 3C1.1, cmt. n.4 between the guilty plea and sentencing in this case, in addition to any other

consequences, the government will be released from its obligations under the plea agreement, and the defendant will not thereby have any right to withdraw from the plea agreement.

### D. Defendant's Waiver of Appeal

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

    (1)    the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 2339C(d)(2);

    (2)    the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 29; or

    (3)    the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)    the defendant was deprived of the effective assistance of counsel; or

(3)    the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings.  In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

### E.  Forfeiture of Assets

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and (G) and Title 28, United States Code, Section 2461 whether in the possession or control of the United States, the defendant, the defendant's nominees,

or elsewhere. The assets to be forfeited specifically include, but are not limited to: Apple iPhone with serial number G6TDV6VA0D83, and an orange HP laptop computer. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his/her rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him/her if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

### F. Waiver of Discovery

As part of this plea agreement, and based upon the concessions of the United States in this plea agreement, the defendant knowingly, willingly, and voluntarily gives up the right to seek any additional discovery. Further, the defendant knowingly, willingly, and voluntarily waives all pending requests for discovery. This waiver, however, shall not apply to any discovery that negates the defendant's guilt.

## II. ELEMENTS OF THE OFFENSE

The parties agree that the elements of 18 U.S.C. § 2339C(c)(1)(A), (2)(A) are as follows:

1. The defendant, while in the United States;

2. Knowingly concealed or disguised the nature, location, source, ownership, or control of material support or resources; and

3. Knew or intended that the support or resources were to be provided in violation of 18 U.S.C. § 2339B, *i.e.*, that they were to be provided as material support to the Islamic State of Iraq and al-Sham ("ISIS"), a designated foreign terrorist organization.

## III.   STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 1 of the Information is: not more than 10 years' imprisonment; maximum supervised release term of life; maximum fine $250,000; and a $100 mandatory victim's fund assessment fee. There is no restitution in this case.

## IV.   COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.   STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are correct and true:

### *Mashkoor planned to travel to join ISIS*

Between September 2022 and December 2023, the defendant, Humzah Mashkoor, communicated with various online covert employees ("OCEs") of the Federal Bureau of Investigation ("FBI") regarding his intent to make hijrah, *i.e.*, travel in order to join the Islamic State of Iraq and al-Sham ("ISIS");[1] to provide money to ISIS to support their efforts; and to recruit others to also support ISIS through travel and/or financial contributions.    Each of the OCEs posed as fellow ISIS supporters and spoke with Mashkoor on mobile messaging applications.  Both ISIS and ISIS-Khorasan ("ISIS-K")—which operates in the Khorasan region, primarily in Afghanistan and Pakistan—are designated foreign terrorist organizations ("FTO") and were at all times relevant to the below-described conduct.[2]

In the fall of 2022, Mashkoor explained to OCE-1 how he came to support ISIS.  In particular, Mashkoor told OCE-1 he previously supported the Taliban but started "looking more into" "the dawlah"[3] (meaning ISIS) "after they b0mbed the airport and took those

---

[1] The word, "hijrah" is the Arabic word for "migration" or "emigration."  When used by ISIS supporters, "hijrah" means traveling to join ISIS.

[2] Although the context of Mashkoor's communications demonstrated that he supported both ISIS and ISIS-K, in his communications Mashkoor frequently referred generally to ISIS whether explicitly or implicitly.  Accordingly, this Statement of Facts often refers generally to ISIS to encompass both FTOs.

[3] "Dawlah" is an Arabic word meaning "state," and is often used by ISIS supporters as a shorthand reference to the Islamic State or ISIS.

Taliban and us soldiers and sent them to jahanam."[4]  In the course of that conversation, Mashkoor told OCE-1 that he was then living "in this disgusting kufr land"[5] and wanted to live in Afghanistan.  Between September 2022 and December 2023, Mashkoor resided primarily in Colorado but also spent time in Texas.

Mashkoor subsequently discussed in more detail his desire and plans to go to Afghanistan "for hijra," *i.e.*, to join ISIS.  With various OCEs, Mashkoor first indicated that he hoped to travel to Khorasan in approximately January 2023 with "UK brothers."  When asked, around that time, what training or experience he had, Mashkoor told OCE-2, "I am prepared to do anything which they require me to do . . . I just want to be used as soon as possible, gun attcks, !st!sh@@d![6] . . . I have no training, I used to have some practice with guns with I was younger. But that is it."  In mid-October 2022, Mashkoor messaged OCE-2 his bayat, or pledge of allegiance, to ISIS leader Abu al-Hasan al-Hashimi al-Qurashi, the text of which was as follows:

> I pledge bayah, my allegiance to Amir ul muhmineen, the khalifah of the Muslims, the mujahid shaykh Abul Hasan Al hashimi Al qurayshi hafidhullah ta ala, to listen and obey, in good times and bad times, and in times of hardship and ease, and to do so selflessly, and not to dispute the command of those in authority unless I see blatant kufr, concerning which we have proof from Allah swt, and Allah swt bears witness to what I say.

Mashkoor ultimately did not travel in early 2023, but, between January and February 2023, he told OCE-2 he still hoped to travel, possibly in March of that year. Mashkoor also told OCE-2 that he had come into contact "with official recruiter" from a

---

[4] "Jahanam" is the Arabic word for the concept of hell in Islam.
[5] The term "kufr" means disbelief in God, His Prophets and His religion, and, in this context, refers to non-Muslims.
[6] This is a reference to "istishaad," an Arabic term used by ISIS supporters for a martyrdom operation in which the attacker is killed.

known ISIS media organization and provided OCE-2 with an online handle for that individual ("Individual 1").

Then, in early March 2023, Mashkoor spoke to OCE-3 and, based on the context, indicated that an ISIS contact suggested to Mashkoor that Mashkoor conduct an attack in the United States. After initially using very coded language, the defendant clarified, "I've been planning to make h!jr@ to the group that we like to for some years now, after preparing and saving [cash emoji cash emoji] for them and all this when I got a contact he told me that it would be better for me to conduct something here rather than over there with them." Mashkoor expressed concern that "it would also have a more negative impact on" his family. Mashkoor later apologized for using "the fortnite code," and explained that he used code "since [his] old group chat all of them got arrested."

Mashkoor also did not follow through with travel to Afghanistan in March 2023. Throughout his conversations with the OCEs, Mashkoor frequently discussed his age— he did not turn eighteen until November 2023—as one reason why traveling would be difficult because, in his view, he needed his parents' approval to travel if he did so before he turned eighteen. Mashkoor also repeatedly told the OCEs that he did not plan to tell his parents his true reason for traveling. For example, when discussing his possible travel in March 2023, Mashkoor said that he had "a plan" that included "tricking [his] other parent" by telling them "it's small vacation to Dubai or Qatar or Pakistan wherever we go." Dubai, Qatar, and Pakistan are three viable locations were Mashkoor could have obtained a visa to enter Afghanistan.

Then, in October 2023, Mashkoor told OCE-3, "Soon I will be departing." He explained that he had decided that there was nothing left for him in "dar ul kufr." Mashkoor

told OCE-3, "I even spoke to my shakyh about it. I was very open about my beliefs making it very obvious I support D but I never said it straight up. He was against it and so is [Relative 1] but I don't care." Mashkoor told OCE-3 that he planned to leave in less than a month and travel through Dubai with the help of his family, and would either get picked up by his family or "the brothers" in Afghanistan. He further explained that he would get a visa and flight to Kabul while in Dubai, and would possibly stay in a hotel there for a couple days. Mashkoor also mentioned that he wanted to meet up with OCE-1 in Dubai to travel together.

Separately, around this time, Mashkoor encouraged OCE-1 to travel with him. In particular, Mashkoor gave OCE-1 the account information for Individual 1, who, as explained above, had been "helping [Mashkoor] prepare for H." In this context, "H" refers to "hijrah." Then, on October 31, 2023, Mashkoor told OCE-1, "I need you to try and sort this out quickly with me because I plan to depart very soon and I want to possibly align my plan with yours in sha Allah." On November 1, 2023, Mashkoor told OCE-1, "Brother, please don't take too long to respond because this is a very time sensitive thing that I have been planning for years now." Mashkoor indicated that he could "maybe get Dubai visa" but could not go through Pakistan.

Mashkoor also took steps in November 2023 to prepare for his travel. For example, in early November 2023, Mashkoor discussed with OCE-1 the need to get vaccinations, saying "Have you gotten your shots? You may need to get shots for malaria and other diseases because they are very prevelant over there." Mashkoor continued, "I need to get mine I still haven't gotten mine and once I do I'm gonna book my tickets to Dubai 2-3 weeks ahead in sha Allah so sometime mid-late November." Mashkoor was

observed traveling to Health Clinic 1 located in Boulder, Colorado on November 6 and 13, 2023.  On November 15, 2023, Mashkoor told OCE-3 that he "got [his] shots"—*i.e.*, "flu, meningitis, typhoid fever, tetanus"—and "medicine for traveling overseas."

At times in the fall of 2023, Mashkoor expressed to OCE-3 that he had considered traveling to Syria instead of Afghanistan to join ISIS.  Ultimately, however, he continually returned to his plan to travel to Afghanistan.  When OCE-3 asked Mashkoor what he expected in Afghanistan,  Mashkoor replied: "Worst case scenario, they throw a vest onto me right away and send me to a Shia temple to attack them. Worst case because I don't want to do that."  When asked if he would do that, Mashkoor said, "I hope they don't want me to do that. I want to be a fighter. Using actual weapons. And doing attacks on the worst of the kuffar, like the leaders or high positions of the taliban. . . . Or Chinese/other foreign diplomats."

On November 25, 2023, Relative 1 booked a plane ticket for Mashkoor with the ultimate destination of Dubai, with stops in New York (JFK) and Kuwait.  The departure date from Denver was scheduled for December 11, 2023.  Although Mashkoor's plans to travel with OCE-1 slowed down after OCE-1 indicated he could not travel at that time, on November 30, 2023, OCE-1 reached out to Mashkoor to let Mashkoor know that Individual 1 told OCE-1 to travel through Turkey.  Mashkoor responded, "[i]f he said that then okay. brother it's up to you. I booked tickets to Abu Dhabi actually and I'm going to be there soon in sha Allah."  Abu Dhabi is approximately 93 miles from Dubai—where Mashkoor was scheduled to travel—in the United Arab Emirates.  Mashkoor then continued, "[a]fter staying there for a bit I will most likely fly from there to Kabul."  Mashkoor indicated that he did not know how long he would stay in Abu Dhabi before

Case No. 1:24-cr-00018-RMR    Document 326    filed 01/30/26    USDC Colorado    pg 12 of 19

flying to Afghanistan. Mashkoor also told OCE-1 that if Mashkoor was "able to go soon" he would let OCE-1 know "how things are" so that OCE-1 would have a "general idea of what it's like."

On December 1, 2023, after informing OCE-3 that Mashkoor scheduled tickets to travel to Dubai, Mashkoor explained that he had not yet booked his onward travel to Kabul because "[t]he brother said" that "[t]he situation changed a lot," "[s]o he told [Mashkoor] to wait to tell him when to book to make sure everything goes okay." Mashkoor confirmed to OCE-3 that "the brother" who gave him that direction was Individual 1. Mashkoor also mentioned that Mashkoor had "some business in the Emirates with family" so Mashkoor may "be there for a little bit."

### Mashkoor attempted to send financial resources to ISIS and concealed the nature, source, or ownership of those resources

In December 2023, Mashkoor also began talking to OCE-4 after he asked OCE-3 for a contact to help with sending cryptocurrency to "the brothers" in Syria. Mashkoor had previously indicated his intent to send money to support ISIS before making hijrah on several occasions. In particular, in mid-March 2023, Mashkoor told OCE-3 that he wanted to send "money over time to the brothers" before he traveled. Mashkoor explained that he could not yet use cryptocurrency because of his age, but that he had "v bucks to send" and wanted to find a way to send them encrypted to someone who could then turn it into cryptocurrency and send it to "the brothers in khurasan or sham or iraq."[7] Mashkoor said that the v bucks would be used to "buy some nice new fortnite skins." When asked if the money would actually be sent through Fortnite, Maskoor replied "[n]o brother, v bucks is code for money." Several months earlier—in late December 2022—Mashkoor told OCE-

---

[7] "Sham" refers to Syria.

2 that he had saved $4,000 for hijrah.

Based on Mashkoor's request for a contact to send money to ISIS fighters in Syria, on November 13, 2023, OCE-3 provided Mashkoor with the username for OCE-4. Mashkoor, however, did not immediately reach out to OCE-4. As Mashkoor explained to OCE-3, before he could send money he had to "get [Relative 1] off of [his] account"—referring to his bank account—because, until then, she could "see whatever purchases" Mashkoor made and would know what he was doing "with the crypto." On November 19, 2023, Mashkoor told OCE-3 that Mashkoor would have to go to the bank to remove her from the account, which he could not do "for at least another week."

Mashkoor was observed going to Bank 1 with Relative 1 on November 17, 2023 and November 29, 2023. On December 1, 2023, Mashkoor told OCE-3 that he "finally got [Relative 1] off [his] bank account" by going through a "whole long process" at the bank. Records from Bank 1 indicate that as of December 1, 2023, Mashkoor opened two accounts in his name only (account numbers ending 8118 and 2071). In doing so, Mashkoor transferred $5,700 into account number 8118 from a separate account that he previously shared with Relative 1 and which was closed on December 1, 2023 (account number ending in 7182).

In the course of a conversation with OCE-3, Mashkoor told OCE-3 that he "may do the crypto" once he got overseas—indicating he had just booked his travel—because "the local intelligence agencies in my country won't be able to get me over there."

Mashkoor and OCE-4 later discussed the logistics of sending money, including whether it should be sent via cryptocurrency or another method. When Mashkoor asked whether he should send the money from the West or when he was in the Middle East,

OCE-4 replied that Mashkoor could do whatever was easier. OCE-4 told Mashkoor that there was a "big push recently" to collect money that would go to "medical equipment gear for the field equipment for the field you can probably imagine what kind [gun emoji] but also clothing for the field." Mashkoor replied, "In sha Allah brother. I am just very nervous regarding all of this. A brother I know told me to download an app called [Cryptocurrency Exchange 1] for the crypto but he didn't help me set it up. Should I use something else? Also, I am using an iPhone with a VPN." The direction to download that particular cryptocurrency application did not come from an OCE.

On December 10, 2023, Mashkoor told OCE-4 that Mashkoor had his new card from the bank so when he "land[ed] in the gulf in sha Allah we can start the crypto process." Mashkoor then told OCE-4 that he could not "clear" his phone because he had to "keep certain things" but planned to "temporarily delete" the mobile messaging application he used to speak with the OCEs. Mashkoor asked, "When I am able to download apps again which app for crypto should I download ?" OCE-4 provided Mashkoor with the names of two cryptocurrency exchanges—Cryptocurrency Exchange 2 and Cryptocurrency Exchange 3. Mashkoor asked, "[w]hich app is safer for me I'm using iPhone with no encryption and I could be getting watched I want to be safe." Mashkoor then told OCE-4 that he downloaded both apps. OCE-4 discussed methods of funding an account on Cryptocurrency Exchanges 2 and 3, and told Mashkoor that he could "wait" until he made it over—referring to Mashkoor's upcoming trip to the Gulf. When Mashkoor asked if he should make a Cryptocurrency Exchange 2 account, OCE-4 replied that Mashkoor could make it now to get it set up and see how it works.

On December 11, 2023, OCE-4 provided Mashkoor with a "[Cryptocurrency Exchange 2] address" that Mashkoor could use to "send it"—referring to cryptocurrency. Mashkoor confirmed, "I will let you know when I do it," and then asked, "[i]s it safe for me to save this somewhere in my phone until I'm able to use it?"

A search of Mashkoor's cell phone—an Apple iPhone with serial number G6TDV6VA0D83—revealed that Mashkoor had applications for Cryptocurrency Exchange 2 and Cryptocurrency Exchange 3. Investigators did not locate on Mashkoor's phone the cryptocurrency address that OCE-4 provided to Mashkoor.

Mashkoor admits that by (1) concealing from his family, including Relative 1, that the true purpose of his travel was to join ISIS, and that he had saved money for that purpose; (2) removing Relative 1 from his bank account; and (3) concealing from Relative 1 that he was doing so in order to covertly provide funds to ISIS, he knowingly disguised the nature, location, source, ownership, or control of the funds in his bank account, some of which he intended to transfer to ISIS via cryptocurrency upon his arrival in the United Arab Emirates.

### Mashkoor's December 18, 2023 arrest

On December 10, 2023, Mashkoor informed OCE-4 that Mashkoor was ill and would "have to delay" his flight "another week." That same day, his travel scheduled for December 11, 2023, was cancelled.

On December 13, 2023, Mashkoor confirmed to OCE-3 that he (Mashkoor) "delayed [his] trip a few days from now" because he had COVID. When asked if his plans remained the same—"West, Dubai, Afghanistan"—Mashkoor replied, "I'm considering possibly meeting with that brother you gave me his @ in S" (referring to OCE-4 who

Mashkoor believed was in Syria).  Mashkoor continued, "But I'm not fully sure."  When asked if Individual 1 knew about Mashkoor's delays, Mashkoor said he did not.  Mashkoor explained, "[Individual 1] is waiting for my confirmation when I am coming if I still decide to."

That same day, Mashkoor's travel was rescheduled for December 18, 2023.  In particular, his new travel itinerary was as follows: depart Denver, Colorado for New York, New York (LGA) at 11:16 am on December 18, 2023, on Airline 1; depart New York, New York (JFK) for Doha, Qatar the morning of December 19, 2023, on Airline 2; and continue on to a final destination of Sharjah, UAE, also scheduled on Airline 2.  Relative 1—who Mashkoor told OCE-3 had rebooked Mashkoor's flight for him—was scheduled to travel with Mashkoor to Sharjah, UAE.  Sharjah, UAE is less than 20 miles from Dubai, and approximately 100 miles from Abu Dhabi.  Relative 1 had a return flight booked on Airline 1 for December 30, 2023, from Dubai, UAE, to Newark, New Jersey, to Denver, Colorado.  Mashkoor did not have return travel booked on any airline.

Mashkoor and Relative 1 arrived at the Denver International Airport on the morning of December 18, 2023.  Agents arrested Mashkoor after he checked his bags and passed through TSA security.

While executing a search warrant later that day, law enforcement agents identified journal entries written by Mashkoor.  Mashkoor previously told OCE-3 that he "wrote a little memoir inside an old journal . . . with a pledge got amirulmum,"[8] and that he hoped Relative 1 found it after he left so she could "get[] a little more clarity."  The entries located after Mashkoor's arrest included drawings of the ISIS flag, along with handwritten text

---

[8] This is a reference to "Amir ul Mumineen," which means "Commander of the Faithful" and is used to refer to the leader of ISIS.

that states, "The Islamic State Remains with Allah's Permission." Another page included, among other things: "Do NOT read until after I am in Watah!" Mashkoor, in handwritten text, went on to explain that he felt isolated since he was young, but then discovered that there were "others like" him. Later pages included handwritten text that stated, among other things:

- "I fell in love with their steadfastness in the face of such animosity. The soldiers of monotheism, the mujahideen."

- "From then on I decided I wanted to be like them. Leaving behind the hypocritical life of humiliation to migrate to the lands of jihad."

- "So once again I state, that I have NO regrets about this blessed path decorated with thorns. And I hope to be granted one of two things. Victory over my enemies, or martyrdom."

- The text of a bayat.

The final page ended with, "make dua that Allah accepts from me and that he forgives me and that he grants me martyrdom. I will never forget all that you've done for me and I'm sorry for how I treated you. Goodbye." It was signed "Humzah."

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing

Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

a) Under U.S.S.G. § 2X3.1(a)(1), cmt. n. 1, the base offense level is 20.

b) There are no applicable specific-offense characteristics.

c) Under U.S.S.G. § 3A1.4, the offense level increases by 12 because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism.

d) The adjusted offense level is 32.

e) The parties agree that the defendant qualifies for a three-level reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1(a), (b). The resulting total offense level is 29.

f) Pursuant to U.S.S.G. § 3A1.4, the defendant's criminal history category is increased to VI.

g) The career offender/criminal livelihood/armed career criminal adjustments do not apply.

h) The advisory guideline range resulting from these calculations is 151–188 months. The guideline range would not exceed, in any case, the 120-month (10-year) statutory maximum applicable to the count of conviction.

i) Pursuant to U.S.S.G. § 5E1.2, assuming the estimated offense level above is correct, the fine range for this offense would be $30,000 to $300,000, plus applicable interest and penalties.

j) Pursuant to U.S.S.G. § 5D1.2, if the Court imposes a term of supervised release, that term may be up to life.

## VII.  ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date: 1-28-26

Humzah Mashkoor
Defendant

Date: 1/28/26

Kathryn Stimson
Attorney for Defendant

Date: 1/30/26

Laura Cramer-Babycz
Assistant U.S. Attorney

Date: 1/30/26

Jasand Mock
Assistant U.S. Attorney